J-S15014-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: A.C.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.M., FATHER | No. 2019 EDA 2015 |

Appeal from the Decree entered May 27, 2015,
in the Court of Common Pleas of Philadelphia County, Family Court,
at No(s): CP-51-AP-0000608-2013
FID# 51-FN-001963-2011

BEFORE:  BENDER, P.J.E, OLSON, and PLATT, [*] JJ.

MEMORANDUM BY BENDER, P.J.E.: **FILED MARCH 03, 2016**

A.M. ("Father") appeals from the decree entered May 27, 2015, in the Court of Common Pleas of Philadelphia County, which involuntarily terminated his parental rights to his minor daughter, A.C.M. ("Child"), born in August of 2007.[1, 2]  We affirm.

The trial court summarized the relevant factual and procedural history of this matter as follows.

Father has a long history of being in and out of jail.  Father has been found guilty or pleaded guilty for different criminal offenses

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] That same day, the trial court entered a separate decree confirming the consent of Child's mother, K.E., to the adoption of Child.  K.E. is not a party to the instant appeal.

[2] We note that the certified record in this case was originally due on July 27, 2015.  However, this Court did not receive the record from the trial court until well past the due date, on October 9, 2015.  As a result, the briefing schedule in this matter was delayed by over two months.

going back to 1995. … Father was not incarcerated at the time Child was born. Father was arrested shortly thereafter on November 25, 2008. Father estimates the last time[] he saw Child was in 2009. The family became known to [the Philadelphia Department of Human Services ("DHS")] on July 19, 2011, when an Order of Protective Custody ("OPC") was obtained. Child was adjudicated dependent on August 2, 2011. Child currently remains in the same foster home [that she was placed in] when she was adjudicated. At the adjudication hearing, the trial court ordered DHS to conduct a Parent Location Search for Father ("PLS"). Father's whereabouts [were] unknown. However, Father had been released from incarceration in June 2011, and he was living in a halfway house. Father was re-arrested in December of 2011. From June 2011 to December 2011, Father did not attempt to visit his Child. [The] DHS case record indicates that Father was not part of the Child's life since the time Child was born. Father became known when he contacted DHS in 2012. At the Permanency Review hearing on April 24, 2012, the trial court found that Father was incarcerated. Again, at the Permanency Review hearing on October 23, 2012, Father was still incarcerated. [I]n December 2012, Father was sentenced for his December 2011 arrest. Father received a sentence of thirty months to seventy-two months confinement. Furthermore, on February 11, 2013, Father was sentenced to one to two years for escape, another offense resulting from his arrest [in] December 2011. Throughout this case, the trial court has found reasonable efforts on behalf of DHS.

Trial Court Opinion, 10/7/2015, at 1-2 (citations to the record omitted).

On October 10, 2013, DHS filed a petition to involuntarily terminate Father's parental rights to Child. A termination hearing was held on May 27, 2015, during which the trial court heard the testimony of Father and DHS social worker, Ms. Barbara Forrest. Following the hearing, the trial court entered its decree terminating Father's parental rights to Child involuntarily. Father timely filed a notice of appeal on June 26, 2015, along with a concise statement of errors complained of on appeal.

Father now raises the following claim for our review. "Whether the trial court erred in terminating Father, [A.M.'s], parental rights, where the trial record established [DHS] failed to make reasonable efforts towards the goal of reunification." Father's brief at 2 (unnecessary capitalization omitted).

We consider Father's claim mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in

the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Father's parental rights pursuant to Sections 2511(a)(1), (2), and (b). We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate under Sections 2511(a)(2) and (b), which provide as follows.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ***
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on

- 4 -

the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted). "[A] parent's incarceration is relevant to the section (a)(2) analysis and, depending on the circumstances of the case, it may be dispositive of a parent's ability to provide the 'essential parental care, control or subsistence' that the section contemplates." *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014) (discussing *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012)).

Instantly, the trial court found that Father's incarceration has rendered him incapable of providing Child with essential parental care, control, and subsistence, and that Father will be unable to remedy the causes of his parental incapacity. Trial Court Opinion, 10/7/2015, at 6. The court observed that Father may not be released from incarceration until 2017, and that, even if Father is paroled at an earlier date, he will not immediately be able to care for Child. *Id.*

Father argues that the trial court erred by terminating his parental rights because DHS failed to provide him with reasonable reunification efforts. Father's brief at 6-7. Father emphasizes that he has attempted to build a relationship with Child by sending her cards and gifts, and by requesting visits and phone contact. *Id.* According to Father, he "was striving to do anything he could within his confines to prevent termination of his rights." *Id.* at 7.

After a thorough review of the record in this matter, we conclude that the trial court did not abuse its discretion by involuntarily terminating Father's parental rights to Child. Initially, we reject Father's claim that his parental rights should not have been terminated because DHS failed to provide him with reasonable reunification efforts. Our Supreme Court recently held that reasonable reunification efforts are not necessary to support a decree terminating parental rights pursuant to Section 2511(a)(2). We have discussed the Court's decision as follows.

> In **In re D.C.D.**, ___ Pa. ___, 105 A.3d 662 (2014), our Supreme Court analyzed the language of Section 2511(a)(2) of the Adoption Act, as well as Section 6351 of the Juvenile Act, 42 Pa.C.S.A. § 6351. The Court reasoned that, while "reasonable efforts may be relevant to a court's consideration of both the grounds for termination and the best interests of the child," neither of these provisions, when read together or individually, requires reasonable efforts. The Court also concluded that reasonable efforts were not required to protect a parent's constitutional right to the care, custody, and control of his or her child.

**In re Adoption of C.J.P.**, 114 A.3d 1046, 1055 (Pa. Super. 2015) (some citations omitted). Thus, even if Father were correct that DHS failed to provide reasonable reunification efforts in this case, he would not be entitled to relief.

Moreover, our review of the record confirms that DHS presented clear and convincing evidence in support of its termination petition. During the termination hearing, DHS social worker, Barbara Forrest, testified that there was no indication in the DHS record that Father was involved in Child's life prior to her placement in foster care. N.T., 5/27/2015, at 48-49. In addition, Child never visited with Father during her forty-six months in care. **Id.** at 44. Ms. Forrest acknowledged that Father has sent letters and cards to Child in the past, but she was not sure if Father had sent anything to Child recently. **Id.** at 41. Father also has requested visits and phone calls with Child. **Id.** at 48, 50. Concerning Father's incarceration, Ms. Forrest noted that Father was denied parole in April of 2015. **Id.** at 44.

Father testified that he has been incarcerated since December of 2011, and that his maximum sentence will expire in December of 2017. **Id.** at 15,

21, 23. However, Father stated that he will be interviewed by the parole board in August of 2015, and that he has "a very good chance" of being paroled. *Id.* at 15, 34. Father explained that he has not seen Child since 2009, but that he has repeatedly requested visits, pictures, and phone contact with Child. *Id.* at 19-21, 25, 30-31, 34. Father indicated that he also has written numerous letters to Child and sent her Christmas presents. *Id.* at 19, 24-25, 34.

Finally, counsel for DHS provided the trial court with a copy of Father's criminal record, which was entered into evidence as DHS Exhibit 53. Father's criminal record reveals that he has a lengthy history of convictions and incarcerations dating back to 1996. DHS Exhibit 53, at 1. That year alone, Father pled guilty to seventeen separate offenses, including robbery and aggravated assault. *Id.* at 1-3. Between 2007 and 2009, Father was convicted of, or pled guilty to, an additional eight offenses. *Id.* at 3-4, 7. In 2013, Father pled guilty to an additional three offenses, including another aggravated assault. *Id.* at 4-5.

Accordingly, the record supports the conclusion of the trial court that Father's incarceration renders him incapable of providing Child with essential parental care, control, or subsistence necessary for Child's physical or mental well-being. Moreover, Father cannot, or will not, remedy his parental incapacity. Father has an extensive criminal history, which spans approximately twenty years. Father has been incarcerated since 2011, and

it is not clear when Father will be released. While it appears that Father has written letters to Child and attempted to have contact with her during his incarceration, these efforts do not make up for the fact that Father is either unwilling or incapable of curbing his criminal tendencies. It was proper for the court to conclude that Child should no longer be denied permanency. *See M.E.P.,* 825 A.2d at 1276 ("A child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.") (citations omitted).

We next consider whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(b).[3] We have discussed our analysis under Section 2511(b) as follows.

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id*. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id*. at 63.

---

[3] While Father does not discuss Section 2511(b) in the argument section of his brief, we will nonetheless consider this issue. *See In re C.L.G.*, 956 A.2d 999, 1010 (Pa. Super. 2008) (*en banc*) (considering Section 2511(b) despite the appellant's failure to challenge the trial court's analysis).

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

Here, the trial court observed that Child has no relationship with Father. Trial Court Opinion, 10/7/2015, at 7. In contrast, the court found that Child has a strong bond with her foster mother, and that removing Child from the care of her foster mother would be contrary to Child's best interest. *Id.* The court concluded that adoption would best serve Child's needs and welfare. *Id.*

We again discern no abuse of discretion. Ms. Forrest testified that Child has resided with the same pre-adoptive foster mother since she was placed in foster care in 2011. *Id.* at 39. Child's siblings reside in the same foster home. *Id.* Child is "extremely bonded" to her foster mother, and refers to her as "mom." *Id.* Ms. Forrest believed that Child would suffer irreparable harm if she were removed from her current placement. *Id.* Ms. Forrest indicated that she has mentioned the possibility of visiting Father to Child, but that Child does not express any interest in having visits. *Id.* at 40-41, 47-48. Ms. Forrest reported that she provided Child with cards and letters from Father, and that Child was "fine with that . . . ." *Id.* However, Child has not written back to Father. *Id.* at 42. Ms. Forrest opined that Child is not bonded with Father, that Child would not suffer irreparable harm if Father's parental rights are terminated, and that termination of Father's parental rights would be in Child's best interest. *Id.* at 45.

Thus, the record confirms that Child is bonded with her pre-adoptive foster mother. In contrast, Father has not seen Child since at least 2009, when she was about two years old. Child has displayed no interest in visiting Father. It is clear that Father and Child do not share a bond, and that Child's needs and welfare will best be served by terminating Father's parental rights, and permitting Child to be adopted.

Accordingly, because we conclude that the trial court did not abuse its discretion by involuntarily terminating Father's parental rights to Child, we affirm the decree of the trial court pursuant to 23 Pa.C.S. § 2511(a)(2) and (b).

Decree affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>3/3/2016</u>